CENTRAL MATERIAL & SUPPLY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 95657.   Promulgated April 24, 1941.

*George E. H. Goodner, Esq.*, for the petitioner.
*Stanley B. Anderson, Esq.*, for the respondent.

OPINION.

KERN: 1. The first issue here is whether or not respondent erred in disallowing a deduction of $22,866.13 claimed by petitioner in its return for the taxable year. This amount represented the balance of an open account due petitioner from the Western Paving Co., which petitioner formally determined to be worthless and charged off in 193C. Neither the amount of the indebtedness nor the fact that it was charged off is questioned by respondent. Respondent contends that the facts at the close of the taxable year, as disclosed by the evidence, did not justify a determination that the account was then worthless.

We agree with the respondent's contention. We have set out in our findings all of the evidence material to this issue. It is apparent that this evidence was almost entirely composed of opinions and conclusions. Neither the balance sheet of Western nor of Harden was introduced in evidence. In view of respondent's determination the burden was upon petitioner to present to us *facts* upon which we would be able to form an independent opinion as to the worthlessness of the debt in question. *Higginbotham-Bailey-Logan Co.*, 8 B. T. A. 566; *M. Rea Gano*, 19 B. T. A. 518. This it has not done.

Respondent's action on the first issue is affirmed.

2. The second issue is whether or not respondent erred in denying an expense deduction claimed by petitioner for legal costs paid in the taxable year in defending its right to receive certain oil and gas royalties. In 1930 petitioner had acquired for a cash consideration the lessor's retained one-eighth royalty interest in the proceeds from the sale of oil and gas from certain lands, and also the lessor's additional overriding royalty of one-fourth of the remaining seven-eighths, under a working or development contract. In 1932 two suits were instituted in a District Court of Oklahoma against petitioner and others, in which the plaintiffs attacked the lessor's title to the land and claimed 17 percent of the oil and gas produced and to be produced from the leaseholds. During the pendency of the suits 17 percent of petitioner's royalties were impounded, amounting to $37,950.60.

We think that the case is ruled by our recent decision in *Morgan Jones Estate*, 43 B. T. A. 691, where we declined to follow *Bliss* v. *Commissioner*, 57 Fed. (2d) 984, which is petitioner's principal reliance here. We see no facts here which would take it out of the rule there laid down. It is true that petitioner had no fee title to the lands, but only an assignment from the fee owner and lessor to the oil company of its reserved one-eighth royalty and overriding one-fourth royalty

in the remaining seven-eighths oil interest; but we do not think it material to determine whether such an interest constituted in itself an interest in land. The material facts are that petitioner's right, whether petitioner is regarded as the holder of a lease or of a profit à prendre, was derivative from its lessor, and the suits in question attacked the lessor's title, and, consequently, the petitioner's right. Petitioner was defending an attack on what in any common sense acceptance of the term was a property interest and the expense incurred was, therefore, a capital expenditure and not an ordinary expense incurred in carrying on petitioner's business.

Respondent is sustained on the second issue.

A short answer can be given to petitioner's alternative contention that, if the impounded funds released to it in 1935 ($37,950.60) are includable in its gross income for that year, as it returned them, they are not properly includable in excess of $27,146.60, since its legal expenditures in protecting them in that year came to $10,804. The fallacy of this argument lies in the fact that it was not merely the gross income for 1935 which was saved to petitioner by its litigation, but its entire right, which, like any other asset of value, was income-producing over several years. To capitalize the cost of that right's protection is, therefore, the only logical way to deal with it.

3. In its pleadings petitioner alleges that the statute imposing the excess profits tax (sec. 702, Revenue Act of 1934) is unconstitutional, and that the tax paid in the amount of $1,871.33 should, therefore, be refunded. In view of the decisions cited below, petitioner, while not waiving the point, declined to argue it on brief. Petitioner's contention is denied. The constitutionality of this statute has been sustained in *Chicago Telephone Co.* v. *United States* (Ct. Cls.), 23 Fed. Supp. 471; certiorari denied, 305 U. S. 628; *Patrick McGovern, Inc.*, 40 B. T. A. 706. Cf. *Haggar Co.*, 38 B. T. A. 141, 143; *W. & K. Holding Corporation*, 38 B. T. A. 830.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

ARUNDELL dissents on the first point.

---

MELLOTT, dissenting: My views upon the second issue are expressed in the dissent which I filed in *Morgan Jones Estate*, 43 B. T. A. 691. The expenditure was made by petitioner to enable it to collect the impounded income, which the court held it was entitled to receive under its lease contract. I think the rule enunciated and applied by the Court of Appeals for the Fifth Circuit in *Bliss* v. *Commissioner*, 57 Fed. (2d) 984, is sound and should be followed.

HILL, dissenting: I disagree with the conclusion of the majority on each of the questions involved.

1. In my opinion the evidence justifies petitioner's action in ascertaining that the debt was worthless and in charging it off in the taxable year.

The debt was owed by the Western Paving Co. and was the accumulation of a seven-year running account for materials furnished, most of which were supplied between 1931 and 1934. Efforts to collect the debt in 1935 were unsuccessful. An analysis of Western's assets and liabilities by four of petitioner's officials and by an independent auditor discloses that the only important asset which Western had was an account receivable from the Harden Mortgage Loan Co., the parent company of both petitioner and Western. All of Harden's assets and income were pledged to secure a bank loan. Harden also owed petitioner an account which the latter had been endeavoring to collect but had been unable to do so. No payments have since been made on the charged-off account.

The foregoing paragraph is a recital of facts found and clearly established by the evidence. The auditor of petitioner (who was also the auditor of Western) testified, "we had tried to effect settlement of the account in some manner, but the Western Paving Company did not have any money to pay the account with. We could not collect it and deemed it as bad, and charged it off." It was further testified that the ascertainment that the debt was worthless and should be charged off in 1935 was the unanimous decision of petitioner's auditor and three of its officials who were in a position to know the financial situation of the debtor. It was also testified that all of the assets and resources of Harden were pledged as collateral to secure a bank loan beginning before the "crash" of 1929 and that the financial condition of Harden got worse as time went on.

Harden owned the stock of both petitioner and Western but neither of the latter two companies owned any stock in the other. There is nothing in the record from which it might be inferred that petitioner was not dealing with Western at arm's length and with diligence in its efforts to collect the debt in question. I think that upon the factual, entirely apart from the opinion, evidence in the record it would reasonably appear to a prudent business man that the debt became worthless in the taxable year, and therefore the deduction should be allowed. *Quinn* v. *Commissioner*, 111 Fed. (2d) 372; *Moore* v. *Commissioner*, 101 Fed. (2d) 704.

2. In my opinion the claimed deduction for attorney's fees should be allowed as an ordinary and necessary expense incurred in carrying on a business.

Admittedly, petitioner was engaged in the business of producing and selling oil. The attorney's fees in question were to secure the enjoyment of income accruing to it from such business. Petitioner had no interest in the title to the land; no title thereto was either acquired by or confirmed in it as a result of the litigation. The title to the land was confirmed and quieted in the owner thereof, the Western Paving Co., and as an incident thereto the owner's right to execute an oil lease thereon was adjudicated by the litigation. According to our holding in *Morgan Jones Estate*, 43 B. T. A. 691, whatever expenditures, if any, the owner made for the purposes of the litigation were capital expenditures. Assuming the correctness of the conclusion reached in that proceeding, the facts there have no parallel in the facts here, and hence it is not a precedent for a like conclusion here. Petitioner's litigation expenses did not represent either an original or additional investment in the land. It had no such investment or title to protect either prior or subsequent to the litigation. The only claim of right petitioner had was to receive income from the oil if, as, and when produced. The production of the oil was a business operation conducted by the lessee separate and apart from ownership in the land.

That part of the subject matter of each of the lawsuits which involved the rights of petitioner consisted wholly of petitioner's right to income represented by oil produced and to be produced in a business operation. That part of such subject matter which involved title to the land concerned only the interest of petitioner's assignor, the Western Paving Co. Petitioner had an economic interest in the oil in place, but that interest gave it only the right to participate in the income represented by the oil if, as, and when its severance from the land occurred. When severance was effected, the oil became income to its recipient and not capital represented by land converted into capital represented by oil or cash. In *Von Baumbach* v. *Sargent Land Co.*, 242 U. S. 503, the Supreme Court referred to its decision in *Stratton's Independence* v. *Howbert*, 231 U. S. 399, involving, among others, the question, "Are the proceeds of ores mined by a corporation from its own premises income within the meaning of the aforementioned act (1909) of Congress?" In connection with such reference the Supreme Court said:

This court held that it was not correct to say that a mining corporation was not engaged in business, but was merely occupied in converting its capital assets from one form to another, and that while a sale outright of a mining property might be fairly described as a conversion of capital from land into money, the process of mining is, in a sense, equivalent to a manufacturing process, and however the operation shall be described, the transaction is indubitably "business" within the meaning of the Act of 1909, and the gains derived from it are properly the income from business, derived from capital, from labor, or from both combined.

It is, of course, settled at this time beyond controversy that mined products and the proceeds thereof, including the products of oil and gas wells, are income rather than converted capital.

In the *Von Baumbach* case the taxpayer was a lessee of mineral lands engaged in developing and working mines thereon. The taxpayer there contended that the decision of the question, above set out, in *Stratton's Independence* was not applicable because in that case the ores were being mined by a corporation upon its own premises. In reply to that contention the Supreme Court said:

In our view, this makes no difference in the application of the principles upon which the case was decided. We think that the payments made by the lessees to the corporations now before the court were not in substance the proceeds of an outright sale of a mining property, but, in view of the terms of these instruments, were in fact rents or royalties to be paid upon entering into the premises and discovering, developing, and removing the mineral resources thereof, and as such must be held now, as then, to come fairly within the term "income" as intended to be reached and taxed under the terms of the Corporation Tax Act.

In the *Von Baumbach* case the Supreme Court quoted with approval from the Supreme Court of Minnesota in the case of *State* v. *Evans*, 99 Minn. 220; 108 N. W. 958, as follows:

The propriety of a lease for the purpose of developing and working mines is recognized by all of the cases, and the rule established by the great weight of authority that such leases do not constitute a sale of any part of the land, and further, that iron or other materials derived from the usual operation of open mines or quarries constitute the rents and profits of the land, and belong to the tenant for life or years, and to the mortgagor after sale on foreclosure, and before the expiration of the time for redemption. The rule, however, has no application to unopened mines, in the absence of a contract, express or implied, for opening and leasing them.

The Western Paving Co. as owner of the land, had the right to exploit and develop it for the production of oil or to assign such right to another. But whether the landowner or its assignee severed the oil, the title thereto upon severance ceased to be an incident to the ownership of the land. Petitioner as assignee of the landowner's rights under the lease contracts succeeded only to the latter's right to receive income represented by royalty payments.

Royalties to a lessor of an oil lease are not a conversion, by severance, of oil in place which he already owns but are consideration paid him by the lessee for the right acquired under the lease. In *Burnet* v. *Harmel*, 287 U. S. 103, the Court, in discussing the character of payments both of bonus and royalties for an oil lease, said:

Under both, the payments made by the lessee are consideration for the right which he acquires to enter upon and use the land for the purpose of exploiting it, as well as for the ownership of the oil and gas; * * *

Title to the oil and gas likewise passes from the landowner when he conducts mining operations on his own land. But, as was pointed out in *Stratton's Inde-*

*pendence* v. *Howbert*, since that is only an incident to the use of his land for oil production, the operation, considered in its entirety, can not be viewed as a sale or conversion of capital assets.* * *

An economic interest in oil in place the character and value of which consist only of the right to receive income from oil if, as, and when produced, is an interest incident to the business operation that produces the oil and is not inherently an interest in land and has no relation to capital investment in the title to land.

The plaintiffs in the litigation apparently did not contest the lessee's right to operate under the lease, but stood by until such operations had produced a substantial quantity of oil and then sought to recover a share of the royalties proportionate to their claimed percentages of ownership of the producing land. It was against this claim that petitioner defended and paid out money for attorney's fees. As between such plaintiffs and petitioner the litigation involved only the right to the income represented by royalty payments in produced oil. That oil was no longer a part of the land from which it flowed, but was income resulting from the operations of the lessee. The fact, if it is a fact, that petitioner in order to protect its rights to such income suc-. cessfully controverted plaintiffs' claims of title to the leased land did not constitute its expenditure for attorney's fees in defending such suits a capital investment in the land or a capital expenditure for any purpose. The expenditure was a necessary one, made to protect its right to the enjoyment of income accrued and to accrue to it in its business of producing and selling oil. *Kornhauser* v. *United States*, 276 U. S. 146; *Bliss* v. *Commissioner*, 57 Fed. (2d) 984.

SMITH and LEECH agree with this dissent.