Missouri-Kansas Pipe Line Company v. Commissioner.
Missouri-Kansas Pipe Line Co. v. Commissioner
Docket No. 112200.
United States Tax Court
1944 Tax Ct. Memo LEXIS 400; 3 T.C.M. (CCH) 15; T.C.M. (RIA) 44009; January 10, 1944
*400 Francis D. Higson, Esq., 70 Pine St., New York, N.Y., and Joseph H. Spicer, C.P.A., 50 Broadway, New York, N.Y., for the petitioner. P. J. Cavanaugh, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined a deficiency in income tax liability for the fiscal year ended September 30, 1940, in the amount of $9,684.31, resulting from the disallowance of numerous expenditures, aggregating $194,659.55, as deductions from gross income. The parties have agreed to certain adjustments which will be settled under Rule 50. Petitioner employs the accrual method of accounting and filed its corporation income and excess profits tax return with the collector for the district of Delaware. There are several issues involving petitioner's claim for deductions. For convenience, the pleadings in this proceeding have been considered as presenting eight issues, and eight separate findings of fact and opinions have been made. Petitioner owned stock in a corporation, Panhandle Eastern Pipe Line Company. The other stockholder was Columbia Oil and Gasoline Corporation. Prior to the taxable year the Federal Trade Commission, the Department of Justice of *401 the United States Government, and the Securities and Exchange Commission instituted proceedings against Columbia for various reasons. Petitioner intervened in these proceedings and expended large amounts for attorneys' fees and other costs. Several issues present the question whether such expenditures are deductible by petitioner as ordinary and necessary expenses incurred in the conduct of its own business, or, whether they were in the nature of capital expenses. See issues 1, 3, 4, Other issues present the following questions: Whether legal expense incurred in a proceeding by petitioner to recover an amount which was paid by petitioner's receivers to an attorney pursuant to an order of the Court of Chancery of Delaware, and which petitioner claimed was an improper allowance by the court, is deductible as a business expense, (Issue 2); whether legal expense incurred in a suit instituted by petitioner against a subsidiary of Columbia for injunctive relief under the anti-trust laws for Panhandle, said suit being a representative suit by a stockholder for the benefit of Panhandle, is deductible as a business expense, (Issue 5); whether legal expense in a suit instituted by petitioner *402 against Columbia for the purpose of enjoining Columbia from obstructing Panhandle in its refunding at a lower dividend rate its class A preferred stock is deductible as a business expense, (Issue 6); whether miscellaneous general legal expenses of petitioner are deductible as business expenses, (Issue 7); whether petitioner abandoned in the taxable year a particular project so as to sustain losses in the taxable year of amounts expended in connection therewith, (Issue 8). Issue 1 Facts 1. Petitioner, hereinafter referred to as Mokan, was incorporated under the laws of Delaware in 1928. In 1929, Mokan undertook the construction of a major pipe line for transporting natural gas from the panhandle of Texas and the Hugoton Field of Kansas to a point near Indianapolis, Indiana. Mokan organized a corporation known as Panhandle Eastern Pipe Line Company, hereinafter referred to as Panhandle, to construct and operate the pipe line. Mokan transferred all of its properties to Panhandle in exchange for all of Panhandle's capital stock. Thereafter, Mokan was a holding company. During the taxable year, Mokan's investment in Panhandle represented about $16,000,000, or more. 2. In September *403 1930, Panhandle was in need of additional capital which Mokan could not supply because of financial difficulties. In order to obtain capital for Panhandle, Mokan entered into a contract under which Columbia Oil and Gasoline Corporation, hereinafter called Columbia, acquired 50 percent of the capital stock of Panhandle. The contract provided, inter alia, that Panhandle would issue $20,000,000 of bonds; that it would issue new capital stock and notes for further contributions to capital, and that Mokan and Columbia would, each, elect 4 directors to Panhandle's board, and that the ninth director would be a neutral person. Subsequently, Columbia violated the intent of the above provision by causing the ninth director of Panhandle to be appointed to Columbia's board of directors. 3. In 1931, Mokan organized another corporation, Panhandle Corporation, to hold its stock in Panhandle. The organization of Panhandle Corporation was also for the purpose of facilitating further financing of Panhandle. Mokan received all of the stock of Panhandle Corporation in exchange for the Panhandle stock. Subsequently, as of January 29, 1936, Columbia owned 75 percent of the stock of Panhandle Corporation, *404 and Mokan owned only 25 percent. 4. Panhandle constructed the pipe line from Texas to the boundary of Illinois and Indiana, and then sought a contract with the city of Detroit to supply the city with natural gas. 5. Panhandle defaulted on its notes. Mokan, having relied upon the interest on these notes to carry certain indebtedness, was unable to meet its own obligations when they fell due. On March 18, 1932, Mokan was forced into receivership in the Court of Chancery of the State of Delaware. On September 29, 1937, it resumed control of its business although the receivers were not discharged, and they have not yet rendered their final accounting. In March of 1932, Panhandle had become subject to the control of Columbia. 6. In 1934, the Federal Trade Commission investigated natural gas companies, including Panhandle, Columbia, and Mokan, and made a report in which it found that the activities of Columbia, Standard Oil Company, and Cities Service Company with respect to Panhandle were in restraint of trade. The Commission recommended legislation to Congress that would prevent monopoly in the natural gas business in the future. Following the Commission's report, the Department of *405 Justice of the United States investigated the Panhandle-Columbia-Mokan situation, and on March 6, 1935, commenced an anti-trust suit against Columbia and others in the United States District Court, District of Delaware. Mokan was not made a party to this suit. The anti-trust suit was for the purpose of enjoining Columbia "from further exercising any dominion or control over Panhandle Eastern Pipe Line Company and from further restraining or interfering in any manner with the free and independent action of Panhandle Eastern Pipe Line Company in the production, trans-portation, or sale and delivery of natural gas to any person or corporation, or in and to any section or community in the United States", and to require Columbia "to divest itself of all of the stock and bonds of Panhandle Eastern Pipe Line Company now owned and hereinafter acquired by it." The Government alleged that the defendants were engaged in a combination and conspiracy to restrain trade and commerce in natural gas among the states of Kansas, Missouri, Illinois, Indiana, Michigan, and Ohio, and to monopolize and to attempt to monopolize trade and commerce in natural gas in the states of Indiana, Michigan, and Ohio, *406 in violation of the antitrust laws. The complaint alleged that to accomplish this purpose, Columbia attempted to prevent the construction of the Panhandle natural gas pipe lines and, failing that, obtained control of the management and operation of this company and its subsidiaries. The complaint further alleged that Columbia after obtaining control of Panhandle, conducted its activities and affairs so as to prevent Mokan from obtaining natural gas from this company; to prevent Panhandle from making available its supplies of natural gas in any manner in competition with the Columbia System in the distribution and sale of natural gas in the states of Indiana, Michigan, and Ohio; and, also, to cause Panhandle to come to such a financial condition that Columbia might be enabled to acquire complete domination and ownership of its physical assets and properties, either by foreclosure of the mortgage securing its bonded indebtedness or otherwise. (The reference to Mokan in the complaint is not explained but may refer to a subsidiary of Mokan.) 7. A consent decree was filed in the above anti-trust suit on January 29, 1936, based upon a stipulation filed on the same date. Section II of the *407 decree provided as follows: "That the defendants be and they are hereby perpetually enjoined from exercising, or attempting, individually or collectively, directly or indirectly, to exercise any dominion or control over Panhandle Eastern and from restraining, or interfering in any manner with, the free and independent action of said Panhandle Eastern in the production, transportation, sale or delivery of natural gas to any person, corporation, community or section of the United States; from holding, acquiring, voting or in any manner acting as the owners, directly or indirectly, of the whole or any part of the stock, or other share capital, or bonds, property or assets of Panhandle Eastern or any other company, corporation, association or organization owning any substantial amount of its securities; and from participating in any way, directly or indirectly, or from exercision any control, discretion, supervision, or influence, in the management or control of Panhandle Eastern; * * *" Section III of the consent decree appointed a trustee, Gano Dunn, to hold the legal title to all Panhandle stock owned by Columbia and to exercise certain rights and privileges incident to the absolute *408 ownership thereof. This section also required Columbia, in accordance with the stipulation, to make an offer to Mokan's receivers providing for the settlement of claims which had been asserted by the latter, and for the acquisition by the receivers of a direct interest in Panhandle to the extent of one-half of the initial common stock outstanding after a recapitalization. Sections IV and V of the decree provided that Columbia be enjoined from restraining or interfering with the financing of Panhandle's contracts, extensions of its pipe line, and the conduct of its business; that any financial arrangements between Panhandle and Columbia be made in such a manner as not to confer upon Columbia any voting rights, control, or participation in the management of Panhandle, or to confer rights or ownership in the properties of Panhandle and that the jurisdiction of the court be retained to give full effect to the decree and the enforcement of compliance therewith. Section IV of the consent decree was intended to provide that the pipe line extension connecting the city of Detroit with the eastern terminus of the Panhandle lines at Dana, Indiana, would be owned and controlled by Panhandle. *409 Mokan was not a party to either the stipulation or consent decree. 8. As of January 29, 1936, the total outstanding capital stock of Panhandle consisted of 2,298 shares, of which one-half was owned by Panhandle Corporation and one-half was owned by Columbia. Mokan's interest in Panhandle at this time was one-eighth and Columbia's interest was seven-eighths. Also, Columbia owned all of the first mortgage bonds of Panhandle, $18,200,000. Panhandle had outstanding $10,000,000 of 6 per cent notes, which were overdue and unsecured, half of which were owned by Columbia, and half by Panhandle Corporation. 9. After the entry of the consent decree of January 29, 1936, Panhandle was recapitalized. Under the recapitalization of Panhandle the following classes of stock in Panhandle were issued: 100,000 shares of class A preferred stock par value $100 per share; 10,000 shares class B participating preferred stock, $100 par value; 648,652 shares of common stock. Of the above stock, Gano Dunn, as trustee for Columbia, received all of the class A and class B preferred stock, and 50 percent of the common stock, or 324,326 shares. The class B preferred stock entitled Columbia to elect 2 directors. *410 Mokan received 324,326 shares of the common stock. An additional 160,000 shares of common stock were authorized, which were represented by two warrants for 80,000 shares, each. One warrant was exercised by Columbia $25for per share. However, under a subsequent agreement between Columbia and Mokan's receivers, dated June 1, 1936, the Mokan warrant could only be exercised by Mokan's stockholders. After Columbia exercised its warrant for the additional 80,000 shares of common stock, it owned 404,326 shares of Panhandle's common stock, whereas Mokan owned only 324,326 shares. 10. On January 12, 1939, the Government filed a supplemental complaint in the original antitrust suit praying that the court exercise the jurisdiction retained by it under the consent decree of January 29, 1936, for the purpose of making the decree effective. The supplemental complaint referred to Columbia's ownership and control of Panhandle as a result of the settlement with Mokan's receivers in April and June of 1936, and stated that the common stock and class B preferred stock, beneficially owned by Columbia, elected 6 of the 9 directors of Panhandle. The complaint stated that it was the purpose of the prior *411 consent decree to divest Columbia of its control and domination over Panhandle, so as to estore Panhandle to a free and independent position, but that the decree had failed to provide any appropriate means to achieve this purpose. The prayer for relief requested, therefore, that Columbia be required to divest itself of ownership of all stock in Panhandle and that a trustee be appointed for the sale of such stock. 11. Mokan filed three applications in the District Court to intervene in the supplemental complaint of January 12, 1939, in the anti-trust suit instituted by the Government. The applications were filed on February 6, 1939, July 5, 1939, and April 16, 1940. The first two applications were filed by Mokan on its own behalf. The third was filed by Mokan on behalf of Panhandle. The first two applications were denied by the District Court and appeals were dismissed by the United States Circuit Court of Appeals for the Third Circuit on December 15, 1939. Missouri-Kansas Pipe Line Co. v. United States, 108 Fed. (2d) 614: certiorari denied, 309 U.S. 687 (April 22, 1940). The third application for leave to intervene was also *412 denied by the District Court on April 23, 1940. An appeal was taken directly to the Supreme Court under the Expediting Act, and on March 3, 1941, the Supreme Court reversed the District Court and granted Mokan leave to intervene in behalf of Panhandle. Missouri-Kansas Pipe Line Co. v. United States, 312 U.S. 502. 12. Mokan's application, filed April 16, 1940, (the third application), was entitled "Application of Missouri-Kansas Pipe Line Company in Behalf of Panhandle Eastern Pipe Line Company for Relief to Which Said Company Is Entitled Under Sections IV and V of the Decree Filed herein January 29, 1936." In the application, Mokan recited that it had sought to have Panhandle and the directors and stockholders thereof bring an action for the relief to which Panhandle was entitled under the consent decree, but that the said directors and stockholders of Panhandle had wrongfully refused; that the application was made in behalf of Panhandle in accordance with the terms of section V of the consent decree in order to make Panhandle a party for the limited purpose of enforcing the rights conferred by section IV of the consent decree; that prior to the entry *413 of the consent decree Panhandle, which was then completely under the control of Columbia and others, had entered into a contract with The Detroit City Gas Company, by the terms of which Panhandle had agreed to supply natural gas to the city of Detroit for a period of 15 years; that at the time the Detroit contract was entered into, as well as at the time the consent decree was entered, the eastern terminus of the pipe line of Panhandle was at Dana, Indiana, and that there was no pipe line connection between the eastern terminus of the pipe line at Dana and the city of Detroit, a distance of 300 miles; that the Detroit contract contained a provision for the construction by Panhandle of a pipe line extension from Dana to Detroit; that the consent decree provided for financing the Detroit extension with financial assistance from Columbia but only upon terms which would not in any way confer any voting rights upon Columbia or give Columbia control or participation in the management of Panhandle; that notwithstanding the decree and the provisions contained therein, which enjoined Columbia and others from acquiring all or any of the property of Panhandle, Columbia, on January 31, 1936, *414 directly acquired from Panhandle that part of the contract under which Panhandle owned the right to construct the Detroit extension, and that Columbia, by means of its control of the board of directors of Panhandle, caused the necessary corporate action to be taken to permit such acquisition; that by reason of Columbia's ownership and operation of the Detroit extension, Columbia has been enabled to take over and control the markets available to the Detroit extension in Indiana and southeastern Michigan, and to restrain trade and commerce in natural gas by Panhandle in said markets and in the Ohio markets of the Columbia companies adjacent to said extension; that Columbia, by owning and operating the Detroit extension, has prevented Panhandle from competing in the Toledo market, as well as in other markets. The application also alleged that Columbia had violated certain provisions of the consent decree by the method it used in purchasing the additional 80,000 shares of Panhandle's common stock so as to acquire a majority of the Panhandle common stock; that the willingness of Gano Dunn to act as the agent and instrumentality of Columbia had made it impossible for him to serve in accordance *415 with the purposes of the consent decree so as to be an insulator against Columbia's control of Panhandle, and that at all times since the entry of the consent decree, Columbia has exercised control and domination over Panhandle in restraint of trade. The application also set forth that Columbia had caused to be issued 100,000 shares of class A preferred stock and 100,000 shares of class B preferred stock of Panhandle in such way as to violate the provisions of section IV of the consent decree. The application alleged that after Columbia had procured the ownership of the Detroit extension and additional common stock in Panhandle, it had further violated the terms of the consent decree through using the Detroit extension and through arrangements with Panhandle so that gas could be transported through the Detroit extension to secure to Columbia a further monopoly in the commerce of natural gas in Indiana, Ohio, and Michigan; and that Columbia had further acted to restrain trade by causing Panhandle to enter into an agreement on March 17, 1936, with one of its subsidiaries named Michigan Gas. The relief prayed for by Mokan in its application was that Panhandle be given the relief to which *416 it was entitled under sections IV and V of the consent decree, and that, in order to afford such relief to Panhandle, a trustee should be appointed to hold all of the stock of Michigan Gas and all interest of Columbia in said company, and that Columbia be ordered to turn over such stock and interest to such trustee to be held by him for the benefit of Panhandle, subject only to repayment to Columbia of sums actually advanced by it for the purpose of construction of the Detroit extension, etc.; that Gano Dunn be directed to deliver and surrender to Panhandle 80,000 shares of its capital stock, and that Columbia be directed to receive in lieu thereof a security which does not in any way confer on it any voting rights, control or participation in the management of Panhandle: that Gano Dunn be directed to vote the common stock and the class A and class B preferred stock of Panhandle "so that the provisions of such preferred stock may be sultably amended to eliminate any and all rights of the stockholders thereof to vote on any matter whatever, including the election of directors"; and for such further relief as the court may deem appropriate under the provisions of section IV of the consent *417 decree. 13. On June 20, 1939, Columbia filed a motion in said anti-trust suit for the approval of a plan for modification of said consent decree. A special master was appointed to hold hearings on said plan and render a report thereon to the court and Mokan was granted leave to participate in said hearings. Hearings were held before the special master and he subsequently filed his report. Mokan participated in said hearings. 14. Mokan expended during the taxable year the following amounts in connection with its participation in and its efforts to participate in the effective carrying out of the consent decree in the Government's anti-trust suit against Columbia and others: (a) Legal fees to various lawyers and
expenses in connection therewith
$37,809.18
(b) Court fees
379.30
(c) Printing costs
1,983.11
(d) Engineering fees and expenses in
connection therewith
4,144.70
(e) Stenographic report
44.75
Total
$44,361.04
Opinion The expenditures for legal fees and other costs of litigation which Mokan made in the taxable year were in connection with all of its applications to intervene in the anti-trust proceeding which the Government had instituted against Columbia and *418 others. Mokan was not a party to the suit and Panhandle had not become a party through intervention, or otherwise. Mokan finally was permitted to intervene only in behalf of Panhandle. The record does not show exactly the result of the anti-trust proceedings. The question is whether or not Mokan's expenses in the taxable year in intervening in the antitrust suit were ordinary and necessary business expenses incurred in the conduct of Mokan's business. The deduction is claimed under section 23(a) of the Internal Revenue Code. Respondent has denied the deduction. In the findings of fact there has been set forth a resume of matters alleged in Mokan's third application to the United States District Court to support the prayer of Mokan that Panhandle be given the full relief intended and prescribed by the consent decree which was entered in January 1936. There have been set forth, also, the most pertinent sections of the consent decree. The nature of the underlying litigation and the relief prayed for in Mokan's application to intervene related to the business of Panhandle and to the control thereof. Mokan was in the position of a minority stockholder since it had a 42 percent interest *419 in Panhandle. Mokan was permitted to intervene only for and in behalf of Panhandle. The direct results of all of the litigation were to affect Panhandle. Panhandle was the heart of the controversy between the Government and Columbia and others. Indirectly, it is true, some of the results were to affect Mokan, but the record in this proceeding, as well as the provisions of the consent decree, show that such indirect results were to relate to Mokan's acquisition of additional stock in Panhandle. Expenditures in connection with litigation for the purpose of acquiring property are not deductible as business expenses. Crowley v. Commissioner, 89 Fed. (2d) 715. Mokan's object in incurring the expenses in question apparently was to add weight to the Government's supplemental complaint of January 12, 1939. Perhaps Mokan expected to aid in bringing about the divestiture of Columbia's voting control over Panhandle. But that result would indirectly or directly increase the voice in voting of Mokan, because if Columbia retained stock in Panhandle and that stock was deprived of voting power, it would follow that the only voting stock would be that which Mokan owned. *420 Under such arrangements, the value of Mokan's interest in Panhandle would be enhanced, and such enhancement in value would be akin to acquiring additional property rights. Crowley v. Commissioner, supra.Of course, the carrying out of other provisions of the consent decree would doubtless have the effect of increasing Panhandle's earnings and profits, and, in turn Mokan's income would be increased. Mokan's income was derived in part, at least, from the Panhandle stock. (The record does not show whether it was the sole source of Mokan's income.) But we are unable to hold that the expenses in question were incurred primarily to preserve and increase Mokan's income. It was at best a speculation whether Mokan's efforts and expenditures would achieve any beneficial result to itself. It is a matter for debate whether or not Mokan's efforts were necessary, the Government having initiated the suit and filed a supplemental complaint; and whether it would be possible to allocate any result of the litigation to Mokan's efforts, as distinguished from the Government's efforts, is certainly open to question. We are unable to approve petitioner's theory that the expenses *421 in question were incurred solely and simply to protect its income from, and investment in, Panhandle. The above considerations, alone, would lead us to sustain respondent. But a stronger reason is found in Mokan's application of April 16, 1940. It was filed on behalf of Panhandle and the relief sought related only to Panhandle. The relief sought was to secure to Panhandle the benefits of the consen decree. In our opinion the expenses in question were incurred by Mokan for the benefit of a subsidiary. Mokan and Panhandle were separate corporate entities; the litigation did not grow out of Mokan's business; and the objects of the litigation pertained to Panhandle's business. Interstate Transit Lines v. Commissioner, 319 U.S. 590; Deputy v. du Pont, 308 U.S. 488. It is held that the expenditures were not ordinary and necessary expenses incurred in the conduct of petitioner's (Mokan's) business. Cf. Kornhauser v. United States, 276 U.S. 145. Under this issue, respondent's determination is sustained. Issue 2 Facts 1. On December 23, 1936, while Mokan was still in receivership in the *422 Court of Chancery of the State of Delaware, the chancellor of said court made an allowance to Depuy G. Warrick for legal services of $125,000, and for expenses in connection therewith of $7,883.14. The services were alleged to have been performed by Warrick in bringing about a settlement between Mokan and Columbia in 1936. Soon after this allowance had been made, information was obtained by Mokan's receivers that Warrick had been employed by Columbia in this matter and that the services rendered by him were thus adverse to the interests of Mokan. Mokan, through its receivers, contending that said allowance should not have been made or, in any event, was excessive, petitioned the court praying that the order granting this allowance be reopened or that leave to file a bill of review be granted. Said petition was denied and petitioner appealed to the Supreme Court of the State of Delaware which affirmed the chancellor. Thereafter a foreign attachment action was commenced by Mokan against Warrick in the Supreior Court of the State of Delaware. New Castle County, to recover from him the amount of said allowance and in that action a writ of attachment issued and an attachment bond was required *423 to be filed. The litigation between Mokan and Warrick commenced in the fall of 1937 and ran throughout the years 1938, 1939, 1940, and 1941. The purpose of this litigation was, in the beginning, to keep from paying said allowance to Warrick and later, after it had been paid, to recover it from him. All the costs of this litigation were assessed against Mokan. 2. During the taxable year, Mokan incurred and expended the sum of $1,100 for premiums on said attachment bond and $51 for stenographic services in connection with said litigation. Opinion Petitioner deducted these expenditures, in the sum of $1,151, as ordinary and necessary business expenses incurred in the taxable year. Respondent alleges, in disallowing the deductions, that the amounts paid Warrick had been awarded to him by the court under his claim of right, and that the subsequent attachment proceeding to recover the same involved the judicial determination of title to this fund. Respondent relies on Central Material and Supply Co., 44 B.T.A. 282; affd. on this issue, sub nom; Farmer et al. v. Commissioner, 126 Fed. (2d) 542; and Morgan Jones Estate v. Commissioner, 127 Fed. (2d) 231, *424 in support of his contention that such fees and costs incurred in securing the judicial determination of rights of title to property are additional costs of the property and, therefore, are capital expenditures. The sum awarded to Warrick consisted of fees and costs for services alleged to have been rendered to Mokan's receivers in the year 1936. Respondent's contentions seem to be based on the form of the proceedings to which petitioner resorted, rather than to the origin and nature of the proceedings. The purpose of the attachment proceeding was to recover money which petitioner thought Warrick had wrongfully obtained. The expenditures were made in the ordinary course of petitioner's business and resulted proximately from that business. They were not capital expenditures nor were they made to perfect petitioner's title as respondent contends. There is nothing unusual in petitioner seeking to obtain by litigation the return of money which it thought was wrongfully awarded to Warrick. In our opinion the expenses involved under this issue were incurred for the purpose of recovering assets of the taxpayer and are thus deductible as ordinary and necessary business expenses. Kornhauser v. United States, supra; *425 Alexander Sprunt Inc. & Sons v. Commissioner, 64 Fed. (2d) 424; Commissioner v. Speyer, 77 Fed. (2d) 824; certiorari denied, 296 U.S. 631. Issue 3 Facts 1. During the taxable year there were pending before the Securities and Exchange Commission certain applications: "(a) An amended application of Panhandle, filed March 2, 1937, for an order pursuant to Section 2 (a) (8) of the Public Utility Holding Company Act of 1935, declaring it not to be a subsidiary company of Columbia Gas & Electric Corporation, or of Columbia Oil & Gasoline Corporation, or of Mokan (or of Henry T. Bush and C. Ray Phillips, receivers thereof), or of Gano Dunn, as trustee; "(b) An application of Columbia Gas & Electric Corporation, filed April 7, 1937, pursuant to Section 2 (a) (8) (A) of the Public Utility Holding Company Act of 1935 for an order declaring that Panhandle and its subsidiary companies were not subsidiary companies of Columbia Gas & Electric Corporation; "(c) An application of Columbia Gas & Electric Corporation, filed April 7, 1937, pursuant to Section 2 (a) (8) (A) of the Public Utility Holding *426 Company Act of 1935 for an order declaring that Columbia Oil & Gasoline Corporation and certain of its subsidiary companies were not subsidiary companies of Columbia Gas & Electric Corporation." 2. The foregoing applications and the proceedings thereunder involved the question of whether Columbia Gas & Electric Corporation, Columbia Oil & Gasoline Corporation, and Panhandle, in their relations to one another, were subject to the jurisdiction of the Securities and Exchange Commission under the Public Utility Holding Company Act of 1935 so that the Commission would have power to direct the ultimate disposition of Panhandle securities owned by Columbia Oil. Mokan was permitted by the Securities and Exchange Commission to be heard in all of said proceedings; Mokan successfully opposed said applications. The Commission entered an order in which it held that Columbia Oil was under the jurisdiction of the Commission and that it must make some disposition of its Panhandle securities in accordance with the provisions of the said Act. 3. Mokan incurred and expended during the taxable year in payment of attorneys' fees for services rendered to it in connection with its participation in said *427 proceedings the sum of $22,835.22. Opinion Respondent disallowed the deduction for the reason that the expenditures were incurred by petitioner as part of its general purpose to divest the control of Panhandle from Columbia and thereby to secure such control for itself. He contends that the expenditures were not incurred in the ordinary course of petitioner's business. We think this contention should be sustained. The expenditures were incurred by petitioner in its capacity as a minority stockholder of Panhandle. The purpose of petitioner's appearance before the Securities and Exchange Commission was to secure an order of the Commission requiring Columbia to divest itself from ownership and control of Panhandle under the Public Utility Holding Company Act of 1935. If this result were accomplished, petitioner believed that in the ordinary course of events, it would obtain such control because at the time of its appearance before the Commission, it owned 42 percent of Panhandle's stock. There can be little doubt that petitioner's appearance before the Commission was motivated solely by its desire to secure control of the corporate stock and management policies of Panhandle. Expenditures *428 incurred to secure such control are not ordinary and necessary business expenses but are in the nature of capital expenditures. Crowley v. Commissioner, supra;Newark Milk & Cream Co. v. Commissioner, 34 Fed. (2d) 854. Respondent's determination on this issue, is, therefore, sustained. Issue 4 Facts 1. During the taxable year petitioner incurred and paid the aggregate sum of $45,296.44 as a result of the distribution to petitioner's stockholders of the stock warrant representing 80,000 shares of common stock of Panhandle, heretofore mentioned in the findings of fact under Issue 1. These warrants were issued in a recapitalization of Panhandle following an agreement under the consent decree of January 29, 1936, in the Government's anti-trust suit. The Columbia warrant, as per agreement, was exercised by Columbia at $25 per share, whereas the market value was in excess of $45 per share. Paragraph III (e) of the agreement of June 1, 1936, between Columbia and Mokan's receivers, provided as follows: "(e) That, when Mo-Kan as a stockholder of Eastern, [Panhandle] or the Receivers in its behalf, receive the warrants *429 evidencing rights to subscribe to the 80,000 shares of Common Stock of Eastern, referred to in Subdivision (c) of Article I of this Agreement, Mo-Kan will distribute, or the Receivers will distribute on behalf of Mo-Kan, to such persons as shall present for appropriate notation thereon certificates for Capital Stock of Mo-Kan (which certificates shall either be registered in the names of the persons so presenting them or be duly endorsed and stamped for transfer to such persons) such warrants pro rata except that each Class B share shall be entitled to one-twentieth of the right accorded each share of the Common Stock. That such rights shall not be exercisable by the Receivers or by Mo-Kan but only by the stockholders of Mo-Kan to whom they shall have been distributed or their assignees as above provided, and that all warrants so received by Mo-Kan or the Receivers which shall not have been so distributed shall be allowed to lapse." The agreement further provided that Columbia could and would purchase from Mokan's receivers at $25 per share the number of shares, up to 40,000 shares, of common stock of Panhandle, represented by the Mokan warrant, which were unexercised by the Mokan *430 stockholders pursuant to the above paragraph III (e) of the agreement. 2. After Columbia exercised its stock warrant, it then owned 80,000 more shares of Panhandle common stock than Mokan owned. After the receivership was lifted in 1937, Mokan entertained the belief that it should be entitled, under the consent decree, to exercise the warrant itself, and made no effort to distribute the warrant to the Mokan stockholders in accordance with the agreement of June 1, 1936. Mokan made several efforts to have this agreement modified in this respect which were in vain. In addition to Mokan's inability to exercise the warrant itself. Mokan also was dissatisfied with the procedure outlined in the agreement concerning the method of distribution to its stockholders. As Mokan had been in receivership for a period of 5 1/2 years, it had no transfer agent, registrar, or up-to-date stockholders' list, and felt that a lot of their stockholders would not avail themselves of the warrant opportunity, resulting in Columbia obtaining a considerable amount of this stock at a large profit. Rather than distribute these warrants to those stockholders presenting their stock for stamping in proportion to the *431 number of shares of Mokan stock outstanding, Mokan felt that the stockholders presenting their stock to be stamped should be allowed to obtain the whole 80,000 shares, in proportion to the number of shares each held. 3. While Mokan was still making attempts to modify the agreement of June 1, 1936, three of Mokan's stockholders brought an action in the receivership proceedings in the Court of Chancery in the State of Delaware to compel the receivers of Mokan to distribute the warrant pro rata among the Mokan stockholders, and that Mokan be compelled to surrender the warrant to the Mokan receivers for distribution. At that time, the market value of the Panhandle common stock was $45 per share. In that suit, the court decided that as between Mokan and the stockholders of Mokan, the latter had a superior right to the distribution of the stock warrant. The Court of Chancery, on June 21, 1939, entered an order directing Mokan's receivers to distribute this warrant to the stockholders of Mokan at Mokan's expense. The order also allowed for distribution of the 80,000 shares to those stockholders presenting their stock for stamping, in proportion to the number of shares held by each stockholder, *432 resulting in Columbia's acquiring only 8 shares of the Mokan warrant instead of an anticipated 20,000 shares. 4. Under the order of the Chancery Court, Mokan distributed the warrant to its stockholders, then numbering between 17,000 or 18,000. The distribution was completed in October 1939. During the taxable year, Mokan incurred and expended the aggregate sum of $45,296.44, which represents the expenses of Mokan in the warrant distribution alone, all of which were incurred subsequent to the distribution order of the Court of Chancery on June 21, 1939. Mokan claimed a deduction for these expenses as ordinary and necessary business expenses during the taxable year. A breakdown of these expenses, all of which were denied as deductions by the respondent, is as follows: Printing and advertising of notices
$ 1,312.99
Transfer sheets
25.00
Services and expenses of Wilmington
Trust Co., acting as agent in the
distribution of said warrants
$19,820.99
Advertising notice in England
924.09
Services and expenses of Bank of New
York
3,161.74
Insurance
10.00
Legal fees
20,042.53
Total
$45,296.44
Opinion Petitioner contends that these expenditures are deductible as ordinary and *433 necessary business expenses since they were incurred under an order of the Court of Chancery of the State of Delaware which required petitioner to distribute Panhandle's stock warrant to petitioner's stockholders and to pay the expenses of such distribution. In this connection, petitioner argues that the expenditures are deductible as being similar to the expenses of any dividend distribution by a corporation to its stockholders. We think this contention must be rejected. The expenditures did not result from any litigation between petitioner and its stockholders in connection with the distribution of the warrant. They represent the legal fees and out-of-pocket disbursements in connection with the actual distribution to petitioner's stockholders. As such, they are not "necessary" and "ordinary" business expenses. The distribution of the stock warrant was in connection with the recapitalization of Panhandle's financial structure. Expenses relating to recapitalization and reorganizations of corporations cannot be deemed "ordinary" expenses. Skenandoa Rayon Corp. v. Commissioner, 122 Fed. (2d) 268, cert. denied, 314 U.S. 696; *434 Motion Picture Capital Corp. v. Commissioner, 80 Fed. (2d) 872; Commercial Investment Trust Corp. v. Helvering, 74 Fed. (2d) 1015; Baltimore & Ohio R. Co. v. Commissioner 78 Fed. (2d) 460. Thus it is apparent that had Panhandle attempted to deduct these expenses such deductions would be denied. Petitioner in its capacity as a stockholder of Panhandle is in no better position than Panhandle. It cannot be said that the expenses of distributing Panhandle stock to petitioner's stockholders is part of petitioner's business. The fact that the expenditures were incurred under court order does not alone justify the deduction. In Interstate Transit Lines v. Commissioner, supra, the Court, in denying the deductibility of an expenditure made under a contractual obligation, pointed out that it is the origin and nature, and not the legal form, of the expenses sought to be deducted which determines the applicability of section 23(a) of the Code. Under the circumstances, it must be held that these expenditures are not ordinary and necessary business expenses incurred in *435 the ordinary course of petitioner's business. Issue 5 Facts 1. In March of 1940, Mokan and Lucille I. Dammann commenced a suit in the District Court of the United States for the District of Delaware against Columbia, Michigan Gas Transmission Corporation, a subsidiary of Columbia, Panhandle, and Gano Dunn, defendants, for injunctive relief under the Federal anti-trust laws. The complaint stated that Panhandle was made a party defendant because of the fact that the action in so far as Panhandle was concerned was a representative one brought for and on behalf of Panhandle and that no relief was sought against the latter. It was stated that Mokan was the owner of 339,275 shares of the common stock of Panhandle, of which 324,326 shares devolved upon it by operation of law, and that Lucille I. Dammann was the owner and holder of 35 shares of common stock of Panhandle. 2. The bill of complaint alleged that the defendants had acquired dominion and control over Panhandle and had prevented said company from extending its natural gas pipe line through Indiana and Ohio into Michigan; and had caused Panhandle to enter into agreements with subsidiaries of defendants for the division of *436 interstate commerce in natural gas, for the division of customers and territory, and for the fixing of prices, rates and charges, and the elimination of competition between Panhandle and said subsidiaries; and had otherwise prevented the expansion and growth of Panhandle. All of these acts were alleged to constitute a combination and conspiracy in restraint of interstate commerce in natural gas in violation of the anti-trust laws to the great and irreparable damage of Mokan because of its large investment in Panhandle. The prayer for relief requested that it be decreed that the defendants were engaged in a combination and conspiracy in restraint of trade against Panhandle; that they be enjoined from engaging in such combination and conspiracy; that they refrain from preventing Panhandle from operating its business and from obtaining the necessary funds for financing the construction of its pipe lines; and that the defendants be enjoined from acquiring, receiving, holding, owning, or voting the common and preferred stock, other share capital, property, assets or facilities of Panhandle and Michigan Gas Transmission Corporation. The prayer also requested that certain directors of Panhandle *437 who were elected or appointed by Columbia or Gano Dunn should be removed and prevented from appointing their successors. 3. Mokan incurred and expended during the taxable year the sum of $6,585.47 for legal fees in connection with the foregoing suit. Opinion Petitioner contends that these expenditures are deductible as ordinary and necessary business expenses. It argues that the litigation was necessary to protect its investment in Panhandle. In general, its contententions are the same as those set forth in Issue 1 and must be rejected for the same reasons. The action against Columbia and its subsidiaries did not arise from any ordinary business activities of petitioner. The action was a representative one brought for and on behalf of Panhandle. The result of the litigation was to directly affect Panhandle and Panhandle alone. Petitioner's only concern was in its capacity of a minority stockholder seeking to enhance the value of the capital assets of Panhandle and thus indirectly to benefit itself. The litigation was part of the continuous struggle between petitioner and Columbia for control of the corporate stock and management policies of Panhandle. Expenditures for that *438 purpose are not deductible as ordinary and necessary business expenses. The expenses incurred by petitioner were for the benefit of Panhandle; the objects of the litigation pertained only to Panhandle's business. As such, the expenditures were not incurred by petitioner in the ordinary conduct of its business, and they are not deductible as ordinary and necessary business expenses. Interstate Transit Lines v. Commissioner, supra;Deputy v. du Pont, supra.Under this issue, respondent's determination is sustained. Issue 6 Facts 1. On May 29, 1940, Mokan commenced a suit in the Court of Chancery of the State of Delaware to enjoin Columbia from obstructing Panhandle from refunding at a lower dividend rate its outstanding class A preferred stock in the amount of $10,000,000 owned by Columbia. Mokan in this suit joined Columbia, Panhandle, and Gano Dunn as defendants. Mokan instituted this suit on its own behalf and on behalf of all of the stockholders of Panhandle. 2. The bill of complaint alleged that Mokan owned 339,275 shares of the common stock of Panhandle, or approximately 42 percent of the total number of shares *439 of said stock; that Columbia owned 404,326 shares of said common stock, or 50 percent thereof, and was also the owner of all of the class A preferred stock and the class B preferred stock of Panhandle; that in a settlement which took place between Mokan's receivers and Columbia in 1936, when Mokan reacquired a direct interest in Panhandle to the extent of 50 percent of the common stock thereof then issued and outstanding. Columbia agreed not to block the refunding of said class A preferred stock at a lower dividend rate; that said class A preferred stock carried a dividend rate of $6 and also participated with the common stock in dividends; that offers had been received from responsible bankers to refinance said class A preferred stock at a flat dividend rate of 4 1/2 percent; and that Columbia through its domination and control of Panhandle had obstructed and prevented the refinancing of said stock. The prayer for relief requested an injunction restraining Columbia from disposing of its shares of class A preferred stock of Panhandle and asked that Columbia and Gano Dunn be prevented from voting on a plan for the amendment of Panhandle's certificate of incorporation and the issuance *440 of new stock by Panhandle and that there should be a refiancing of Panhandle's preferred stock. It was prayed, also, that the defendants be restrained from paying or receiving dividends at the prevailing rate on the then outstanding preferred stock of Panhandle. 3. The suit was brought to enable Panhandle to retire its class A participating preferred stock at a lower dividend rate, and to require Columbia to carry out contractual duties in connection with the refinancing of such stock. The litigation was still pending at the end of the taxable year. 4. Mokan incurred and expended during the taxable year in connection with the foregoing suit the sum of $8,153.32 in payment of attorneys' fees. Opinion Petitioner's contentions, in support of its position that the expenditures under this issue are deductible as ordinary and necessary business expenses, are substantially the same as made under Issue 1. Respondent's position is that these expenditures, incurred in litigation having for its purpose the amendment of a corporate charter and the refinancing of preferred stock, are in the nature of capital expenditures. Respondent's determination should be sustained. The litigation *441 was instituted by a minority stockholder against the majority stockholder for purposes pertaining to the capital structure of Panhandle; i.e. for amending the certificate of incorporation, for retiring class A participating preferred stock, and reissuing non-participating preferred stock at a lower dividend rate. The expenditures were, therefore, in the nature of capital expenditures and are not ordinary and necessary business expenses within the purview of the statute. Emerson Electric Mfg. Co., 3 B.T.A. 932; Holeproof Hosiery Co., 11 B.T.A. 547; Blumberg Bros. Co., 12 B.T.A. 1021; Peaslee-Gaulbert Co., 14 B.T.A. 769; Borg & Beck Co., 24 B.T.A. 995; Pacific Coast Biscuit Co., 32 B.T.A. 39, Skenandoa Rayon Corporation v. Commissioner, supra.
Issue 7 Facts 1. During the taxable year petitioner incurred and expended as general expenses not applicable to specific matters the following amounts: In payment of attorneys' fees for or-
dinary corporate work, corporate
reports, meetings of directors, ad-
vice to officers and directors on
matters generally
$17,951.53
Transportation by air of attorneys
and officers of petitioner
501.94
Reimbursement of officers of peti-
tioner for travel, hotel and other
expenses
60.55
Engineering services
850.00
Bond premium, postage, telephone
184.70
$19,548.72
*442 None of the above expenditures were connected with any of the matters involved under the issues heretofore discussed. Opinion Respondent's position in disallowing the deduction for these expenditures is that these expenses, like those incurred under the other issues, were charged to a reserve for legal expenses. Respondent contends that while they might have been incurred for general and routine corporate work, they were nevertheless connected with and related to these other matters, some of which are not deductible as ordinary and necessary business expenses. The record does not sustain respondent's position. At the trial both parties, by joint exhibit 3-C, acknowledged these expenditures to have been for general matters not allocable to any of the other matters herein involved and the only testimony on the point supports petitioner's contention that the expenses were for ordinary corporate work of a routine nature. It is held that the expenditures under this issue are deductible as ordinary and necessary business expenses. E. C. Laster, 43 B.T.A. 159; reversed on another issue in 128 Fed. (2d) 4; Journal Co., 44 B.T.A. 460; *443 reversed on another issue, 125 Fed. (2d) 349. Issue 8 Facts 1. During the years 1939 and 1940, Mokan made extensive investigations in the State of Michigan with a view to the building of a natural gas trunk line from the foot of Lake Michigan westerly to Flint, Pontiac, Saginaw, Bay City and other communities which were served by distribution systems owned by Consumer's Power Company. Mokan's purpose was to build and operate this pipe line itself, should the investigation prove to be successful. Mokan's plan was to obtain the gas from Panhandle. 2. Mokan entered into negotiations with Consumer's Power Company; however, before any physical assets were acquired, before any contracts were consummated, and before an application was made to the Michigan Public Service Commission, Panhandle contacted and came to an understanding with Consumer's Power Company with respect to building a pipe line and supplying this gas on its own behalf. Mokan abandoned its project believing it would not be wise to attempt to compete with Panhandle. A contract was finally consummated between Consumer's Power Company and Panhandle on April 30, 1941. 3. The following expenditures *444 were incurred and made by petitioner during the taxable year in connection with the investigation: Legal fees and expenses in connec-
tion therewith
$14,867.99
Expenses of W. G. Maguire, president
of petitioner
500.00
Engineering fees and expenses
951.88
Salary of employee and allocation of
office salaries
300.00
$16,619.87
The following expenditures were incurred and made by petitioner during the year preceding the taxable year: Traveling expenses of employee
$ 405.65
Expenses in connection with legal
services
12,853.36
Engineering fees and expenses
1,254.00
Expenses of W. G. Maguire, president
of petitioner
1,000.00
$15,513.01
Total for both years
$32,132.88
4. Mokan did not abandon this project in the taxable year. Opinion Petitioner contends that total expenditures of $32,132.88 incurred in the prosecution of the investigation are deductible as a loss in the taxable year under section 23(f) of the Internal Revenue Code. Respondent contends that the project was not abandoned in the fiscal year and that, consequently, the loss was not sustained in the taxable year. The sole question is whether the project was abandoned during the taxable year. *445 The only evidence is the testimony of a witness called by petitioner. At first he stated that Mokan abandoned the project in the early part of 1940 when Panhandle negotiated with Consumer's Power Company and agreed on the terms of the contract, which was consummated at a later date. The witness, when reminded that the contract between Panhandle and Consumer's Power Company was finally executed on April 30, 1941, then said that the abandonment might have taken place much later in the year of 1940 than he had previously stated. In reply to a further question from the court, the witness stated that he did not know when the terms of the contract between Panhandle and Consumer's Power Company were first agreed upon. The burden of proof lies on the petitioner. Petitioner has not shown that the abandonment took place in the taxable year. It is held that the total expenditures are not deductible as a loss sustained in the fiscal year ended September 30, 1940. TennesseeConsolidated Coal Co., 24 B.T.A. 369. Decision under all issues will be entered under Rule 50.